# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**JOSEPH M. MANFREDONIA,**               Chapter 7
    Debtor                          Case No. 14-13014-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**NORTHEAST COMMUNITY BANK**,
    Plaintiff,
v.                                       Adv. P. No. 15-1053
**JOSEPH M. MANFREDONIA**,
    Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Complaint filed by the Plaintiff, Northeast Community Bank (the "Plaintiff" or the "Bank"), a creditor of the debtor, Joseph M. Manfredonia (the "Debtor," the "Defendant," or "Mr. Manfredonia") through which it seeks denial of the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(3) and (a)(4)(A) on grounds that the Debtor failed to keep and preserve adequate books and records and knowingly and fraudulently made false oaths in his sworn documents filed in his bankruptcy case. Specifically, through Count I, the Plaintiff alleges that the Debtor made false oaths by failing to disclose in his Statement of Financial Affairs ("SOFA"), as well as

1

two amended SOFAs, which he executed under the penalty of perjury, that he made monetary transfers from his bank accounts to bank accounts owned by his spouse, Lauren Totman-Manfredonia ("Mrs. Manfredonia" or "spouse") at various times in 2014. Through Count II, the Plaintiff complains that the Debtor either failed to keep books and records or concealed records from which his income and that of his non-debtor spouse could be ascertained. In his Answer, the Defendant denied the material allegations of the Complaint.

The Court entered a pretrial order, and the parties, in compliance with that order, filed a Joint Pretrial Memoranda in which they agreed to numerous facts. The Court held a trial on May 9 and 10, 2016 and June 16, 2016 at which four witnesses testified. The Court admitted into evidence over 40 exhibits, all of which were introduced by the Plaintiff, consisting primarily of bank and investment account statements from various financial institutions maintained by the Debtor, by the Debtor and his spouse, by his spouse, or by business entities controlled by the Debtor and his spouse.

Following the trial, both parties submitted Proposed Findings of Fact and Conclusions of Law. Based upon the agreed facts, testimony, exhibits, and applicable law, the Court makes the following findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052. This is a core proceeding in which this Court has authority to enter a final order and judgment. *See* 28 U.S.C. § 157(b)(2)(J).

## II. FINDINGS OF FACT

A. <u>The Debtor, His Companies and the Properties</u>

The Debtor filed a voluntary Chapter 7 petition on June 25, 2014, and John O. Desmond was appointed the Chapter 7 Trustee. Mrs. Manfredonia is not a debtor in this or any other bankruptcy case.

The Debtor is a college graduate and also a certified public accountant. He was employed as an accountant and auditor for two accounting firms for several years, including the firm of Jacobs, Velella & Kerr, P.C., the accounting firm which prepared tax returns for limited liability companies formed by the Debtor (Exhibits 45 and 46). In addition, the Debtor served as a comptroller for a publicly traded, international company which he identified only as "ADE." He also held the positions of chief financial officer at companies he identified as "Berringer" and "INMED" before establishing his own commercial real estate management and consulting businesses. The Debtor admitted that he is "pretty sophisticated with financial accounting."

In 2002, the Debtor founded Bettencourt Realty, LLC ("Bettencourt") and BMC Realty LLC ("BMC"), both Massachusetts limited liability companies which have a usual place of business at the Debtor's residence located in Lynnfield, Massachusetts. BMC is the manager of Bettencourt and Manfredonia is the manager of BMC. BMC and Manfredonia are the sole members of Bettencourt, and BMC is owned by the Debtor and a number of other individuals, including members of his family. Bettencourt and BMC

3

owned and operated real estate in Peabody, Massachusetts and also provided bookkeeping and consulting services to third party clients. Neither the Debtor nor Mrs. Manfredonia could credibly substantiate the amount of income Bettencourt and BMC derived from bookkeeping and consulting.

The Debtor testified that he worked for, and was paid by, Bettencourt and BMC. Mrs. Manfredonia testified that she worked for and was paid by BMC, but then indicated that she was employed by LTM Enterprises. The Debtor was primarily responsible for maintaining the records of the two entities. Neither the Debtor nor Mrs. Manfredonia produced W-2 statements or 1099s with respect to their compensation from Bettencourt, BMC or LTM Enterprises.

In 2005, Bettencourt acquired three adjacent buildings in Peabody, Massachusetts (the "Properties"), which, according to the Debtor, consisted of "a 6,000 square foot commercial site, another 4,000 square foot attached commercial site -- residential site to that and a 16-unit residential site and a three-unit residential site was [sic] 111R Rear Main Street, 111 Front Main Street, 2 Washington Rear Main Street and 2 Washington Front Main Street." Bettencourt leased the units to residential and commercial tenants. To obtain the Properties, the Bank, in November of 2005, agreed to loan Bettencourt and Manfredonia $2,300,000 to be secured by a mortgage on the Properties. The loan agreement between the Bank and Bettencourt required Bettencourt and Manfredonia to submit periodic financial information to the Bank.

4

From 2005 to 2013, the Debtor made his living from ownership and management of BMC, Bettencourt, and the Properties, although he and his spouse also were active stock market investors, at least in 2013 and parts of 2014, as evidenced by their trading in their Fidelity Investments and TD Ameritrade accounts. They reported their occupations as "Investment" on their 2013 federal income tax return (Form 1040), which the Debtor prepared.

As noted above, the Debtor maintained the books and records of Bettencourt and BMC. He initially maintained paper records until 2006 or 2007 when he testified that he began using QuickBooks software. The Debtor testified that those records were lost in a computer crash. Thereafter, he kept records using a web-based system and paid bills and accessed records online. He testified that he never finished recreating the records he lost in the computer crash.

The Debtor annually would prepare trial balances for Bettencourt and BMC for his accountant, including trial balances for years 2012 and 2013. He did so by reviewing on line transactions, and sending the trial balances to the companies' accountant for preparation of tax returns. The Debtor and his spouse filed joint tax returns in 2012, 2013, and 2014. The Internal Revenue Service audited some of those returns but assessed no additional taxes.

The Debtor testified that BMC and Bettencourt maintained certain paper records, including leases, contracts, and statements from the municipal housing authority in several locations in one of the Properties. He also testified that those entities maintained

certain records on a flash drive, all of which were stored in file cabinets in shared common space located in one of the Properties.  The Debtor stated that in January 2014 he realized that the records had been destroyed by a tenant who vacated the premises in late 2013.

B. The Receivership and Foreclosure

Sometime in 2013, Bettencourt lost its primary commercial tenant, and it defaulted on the Bank's mortgage in the fall of 2013.[1]  Bettencourt made its last mortgage payment to the Bank in October of 2013.  As a result, approximately three months later, in February of 2014, the Bank filed a civil action in the Essex Superior Court, Department of the Massachusetts Trial Court, against Manfredonia and Bettencourt, requesting the appointment of a receiver over Bettencourt's assets.   On March 20, 2014, the Superior Court entered an order appointing Peter Sutton, Esq. as Receiver for the Properties ("Sutton" or the "Receiver").  The Superior Court docket is unclear as to the effective date of the order as it was stayed for a short period of time.  Thus, although the precise date when the Receiver assumed his duties is unknown, Sutton filed his first report in mid-May, 2014.

In his interim report filed with the Superior Court on May 14, 2014, the Receiver described the Properties, stating that the owner "has put little time or money into [the Properties]," and observing that extensive repair work was needed.  He added that cash flow would not permit all repairs.  He also stated that the Debtor "has been less than

---

[1] Attorney Christopher Fein, who represented the Debtor in his Chapter 7 case, was paid $2,500 by Bettencourt Realty on October 7, 2013.

6

cooperative with the Receiver" and had delivered only "a few uncashed checks and the

checking account statements from March, 2013, and some non-current real estate tax bills

and liability policies." He added the following:

> [H]e [the Debtor] failed, after numerous requests, to turnover Bettencourt's
> billing records, any personal property, any security deposits, rent rolls,
> leases, tax returns, and books and records, such as the operating or
> management agreements of Bettencourt or QuickBooks relating to
> Bettencourt

Sutton further reported that from March 2013 to March 2014 the Debtor used

Bettencourt's cash for his personal use. Moreover, he stated that the Debtor caused

Bettencourt to transfer a total of $16,000 to a checking account he controlled between

February 6, 2014 and March 19, 2014, while the motion for appointment of a receiver was

pending. In his report, the Receiver stated that certain tenants claimed that in April of

2014 they paid rent directly to the Debtor, but that the Debtor did not turnover the rental

payments to him. The Receiver also noted that he had reviewed debit charges and

canceled debit cards in the Debtor's name and that of his spouse. He identified numerous

questionable and undocumented payments made by Bettencourt, including restaurant

charges ($363.92), gasoline station charges ($8,010.29), as well as payments to Starbucks

($4,350), Latitude Sports Club ($3,459.75), and long term care insurance ($2,232.44).

Sutton also indicated that from September 2013 to March 19, 2014 the sum of $53,300 was

transferred from Bettencourt to an account controlled by the Debtor, adding: "[n]o books

and records have been provided to explain or justify these transfers." The Receiver

concluded his interim report by stating that a total of $99,126.76 had been transferred or

7

spent for purposes unrelated to Bettencourt's operations.  Sutton served a copy of the report on Christopher Fein, Esq., Bettencourt's attorney at the time.

On November 14, 2014, the Receiver filed his final report with the Superior Court. In that report, he stated that the Debtor had not cooperated with him, that the Receiver had filed a petition to compel the Debtor to comply with orders to turnover assets and records, and that the hearing on that request had been stayed by the filing of the Debtor's Chapter 7 petition. Sutton indicated that he had collected $121,075.25 in rents, made disbursements of $55,089.87 for expenses incurred in the operation of the Properties, leaving a balance of $65,985.38.  He requested fees for his services and that of his law firm in the sum of $73,667.50.  The Superior Court approved the Receiver's Final Report, allowed his fees, and discharged him.  The state court specifically permitted the Bank to pursue claims against the Debtor "in the event [the Debtor]" does not receive his discharge in his bankruptcy proceedings."

Sutton testified at the trial, based upon completion of his duties as Receiver, that he believes that the Debtor converted approximately $99,000 of Bettencourt's funds, including rents and other monies in bank accounts during the year preceding the Chapter 7 petition date.  At trial, Sutton testified that tenants had paid security deposits, and that, despite his demand for turnover of security deposits and records concerning them, the Debtor failed to deliver them to him.

On August 26, 2014, this Court granted the Bank relief from the automatic stay,[2] and, thereafter, on October 3, 2014, the Bank conducted a foreclosure sale of the Properties.  The foreclosure sale did not satisfy the amount due the Bank, which then filed a proof of claim in the Debtor's Chapter 7 case for the deficiency after foreclosure in the sum of $592,376.50.

C. Transfers Between Various Bank Accounts

The Debtor and his spouse, both individually and jointly, maintained a number of bank accounts and several brokerage accounts.  The Plaintiff introduced into evidence voluminous monthly bank and investment account statements for 2013 and 2014, including multiple accounts at Fidelity Investments in the name of the Debtor and his spouse, (Exhibits 22 and 23)[3]  statements from a joint TD Ameritrade account ending in 8834 (Exhibit 24) and a TD Ameritrade account in Mrs. Manfredonia's name ending in 6065 (Exhibit 25); bank statements from Bank of America, N.A. for eight accounts, one in the Debtor's name (account ending in 2878) (Exhibit 28), two in his spouse's name (accounts ending in 3302 and 2778) (Exhibits 30 and 28, respectively), two in their joint

---

[2] The Bank sought permission to file, after the foreclosure proceeding against a non-debtor, an Affidavit Regarding Notice to Pursue Foreclosure and Deficiency against the Debtor.

[3] The Debtor had three accounts at Fidelity Investments which were consolidated and reported on one statement:  a Fidelity Cash Management Account ending in 7837, a Fidelity Account ending in 7845 and a Fidelity Roth IRA account ending in 6199.  Mrs. Manfredonia had two accounts at Fidelity Investments that were reported on consolidated statement:  a Fidelity account ending in 6450 and a Fidelity Roth IRA account ending in 6364.

names (accounts ending in 5567 and 6160) (Exhibit 29), two in the name of BMC (accounts

ending in 1110 and 2849) (Exhibits 27 and 32) and one in the name of Bettencourt (account

ending in 2852) (Exhibit 31); statements for eight Citizens Bank accounts, three joint

accounts (accounts ending in 8465, 0057 and 0926) (Exhibits 36, 38, and 39, respectively),

two accounts held by Mrs. Manfredonia (accounts ending in 8457 and 0934) (Exhibits 34

and 37, respectively), one held by Bettencourt (account ending in 0906) (Exhibit 41), one

held by BMC (account ending in 0752)(Exhibit 40), and one joint account that eventually

was held only by Mrs. Manfredonia after March 14, 2014 (account ending in 1441)(Exhibit

35).   The Plaintiff also introduced into evidence two 1099 forms from "Pruco Life

Insurance Company" with respect to accounts that were held separately by the Debtor

and Mrs. Manfredonia, as well as 2012, 2013 and 2014 tax returns for BMC, Bettencourt

and the Manfredonias.

A review of the bank statements introduced into evidence for the joint Citizens

bank account shared by the Debtor and his spouse ending in 8465 (Exhibit 36) reveals

that, during 2013, deposits into that account totaled $136,372.78.  A review of the Citizens

Bank statements for their joint checking account ending in 1441 (which became Mrs.

Manfredonia's sole account on March 14, 2014) reflects that, during 2013, deposits totaled

approximately $149,000.

The bank statements reflect thousands of transactions, including debits for checks,

wire transfers, debit card charges, as well as online and cash deposits.  A review of the

transactions reveals that the Debtor and his spouse were constantly moving money to

10

and from their various bank and investment accounts.  The Debtor did not dispute that

he and his spouse owned or controlled the aforementioned bank and brokerage accounts.

According to Mrs. Manfredonia, the Debtor controlled the flow of monies into and out of

all the accounts.   When asked if there was any "rhyme or reason" for determining

whether to put money into a joint account or a separate account, the Debtor engaged in

the following colloquy with Plaintiff's counsel:

> "Q. . . . What was the rhyme or reason behind how you would determine
> whether to put money into a joint account of as separate account?
> "A. I don't know if it's really determined. It wasn't set up to put money in
> specific accounts. What happens is you go into a bank to set up a joint
> account and they give you an individual account. That's my understanding
> of how it normally works. So -- so there wouldn't be that much of a balance
> in individuals accounts.
> "Q. so maybe I didn't ask the question very well. So was there some
> principle that you and your wife followed in the last five years to determine
> whether the money should be deposited individual accounts versus joint
> accounts?
> "A. No, not that I'm aware of.
> "Q. Were there any particular accounts upon which there was some
> principle followed in determining whether funds should be deposited to or
> retained in a particular account?
> "A. Well, that's a broad question. You know normally funds that pertain to
> both of us or, for example from BMC, would be deposited into a joint
> account for both of us.
> "Q.   . . . Were there any accounts in the last five years which were
> maintained expressly for the sole benefit of either you or her?
> "A. Well, I believe that she maintained -- yes, there would be. She had her
> inheritance that she used in a specific account. At times that was transferred
> to me back to her depending upon which brokerage account we used for
> commissions to reduce commissions. As far as income goes, I believe most
> of the stuff went into joint accounts, but she might have put something into
> her individual account, so I really can't speak to that but there wasn't a
> grand scheme of identifying specific accounts. Again, these banks pretty
> much just set up accounts, give you an individual account as savings
> account with that joint account."

A review of the Debtor's Fidelity Investments statements (Exhibit 22) reveals that he initially made small investments and then, beginning in September of 2013 through the end of that year, made thousands of trades. The Debtor's Fidelity Investments account statements for 2013 and 2014 reveal that the shear length of the statements increased from 8 to 11 pages to 65 pages in November and December of 2013 reflecting day trades at a time when Bettencourt had defaulted on its payments to the Bank.  With respect to account number ending in 7845, the Fidelity Investment Report for December 1, 2013 through December 31, 2013 shows securities bought totaling $692,882.77 and securities sold of $680,275.24.  The Fidelity Investment Report for the period from January 1, 2014 through January 31, 2014 shows that the Debtor bought securities with a value of $367,637.31 and sold securities valued at $351,460.81.  Nevertheless, as of May 31, 2014, the month before the Debtor filed his Chapter 7 case, the total value of the Debtor's three Fidelity Investments account was $13,233.13, mostly attributable to his Roth IRA.  The Fidelity Investments account ending in 7845 had a value at the end of 2013 of $40,107.64; and one month later, at the end of January 2014, its value was $102.71.

As noted above, the Debtor and Mrs. Manfredonia also had a joint account with TD Ameritrade and that Mrs. Manfredonia had another account at TD Ameritrade in her name.  The March 1, 2014 to March 31, 2014 statement for their joint account (Exhibit 24) reflects deposits totaling $11,000. The statement for Mrs. Manfredonia TD Ameritrade account, which included a margin component (Exhibit 25), reflected a current value of $26,836.19, as well as the purchase of $45,275.39 in securities, the sale of securities valued

12

at $35,076.09, and a deposit of $37,035.40 at the end of March 2014.  The statement for the period from April 1, 2014 through April 30, 2014 shows the purchase and sale of securities of $538,730.02 and $528,059.55, respectively.  The statement for the period between August 1, 2014 and August 31, 2014 reflects year to date securities purchased in the sum of $2,496,097.99 and securities sold in the sum of $2,498,951.71.  On the couple's Schedule D to their joint federal tax return for 2013 pursuant to which they reported capital gains and losses, the Manfredonias reported losses of $25,497 on the sale of securities valued at $2,774,049 with a cost basis of $2,868,419 as adjusted, together with a short term carryover of $1,305.  On Schedule D to their 2014 federal income tax return, they reported losses of $19,217 which when added to a capital loss carryover of $26,802 resulted in a net short term capital loss of $46,019.

As noted above, at trial, the Debtor did not produce any summaries, ledgers, worksheets, or other records of his business or personal transactions to explain how he and his spouse determined their incomes, and he also did not produce deposit slips, invoices, receipts or other paper or electronic records for himself, his spouse or the business entities.  The Debtor and Mrs. Manfredonia did not submit any records tracking monies that they held individually or records tracking monies that they held in joint accounts.  They treated their bank and brokerage accounts as if they were owned jointly regardless of the denomination of the accounts.  The Debtor also produced no records that would explain how he and his spouse could engage in the purchase and sale of stocks

worth millions of dollars in view of their reported taxable income on their 2013 federal income tax return of $26,146.

According to both the Debtor and Mrs. Manfredonia, Mrs. Manfredonia inherited approximately $140,000 from her parents in or around 2008.  The Debtor did not submit into evidence any documents concerning this inheritance or how the money was spent. Mrs. Manfredonia testified that the monies went into various bank accounts and were commingled with other funds. The Manfredonias also purchased two annuities from Prudential in the sum of $10,000 each, one in the Debtor's name and one in the name of Mrs. Manfredonia.  In late September of 2013, the two Prudential annuity accounts were closed and the proceeds were deposited, on September 24, 2013, into the couple's joint bank account ending in 1441 at Citizens Bank.  On the same day, they transferred $20,000 to a joint Citizens Bank account ending in 8465.  Two days later, they transferred the $20,000 to the Debtor's Fidelity account ending in 7845.

During the latter part of 2013 and through mid-2014, the Debtor made a number of transfers from joint accounts held with his spouse to accounts held only by Mrs. Manfredonia, as set forth below:

On May 16, 2014, the Debtor transferred $1,600 from the couple's joint Citizens Bank account ending in 8465 to his spouse's Citizens Bank account ending in 0934.

On June 12, 2014, the Debtor transferred of $1,347 from the couple's joint Citizens Bank account ending in 8465 to Mrs. Manfredonia's Citizens Bank account ending in 0934.

14

On June 13, 2014, the Debtor transferred $4,000 from the couple's joint account at Bank of America ending in 6160 to Mrs. Manfredonia's Bank of America account ending in 3302.

The Debtor did not disclose these transfers on his original SOFA or amended SOFAs in response to question 10a, regarding transfers within two years immediately preceding the commencement of the case.

In January of 2014, the Debtor closed his account at Bank of America ending in 2878, which he did not disclose on his original SOFA or amended SOFAs in response to question 11. In April of 2014, he closed BMC's Bank of America account ending in 2849 and, in May of 2014, he closed Bettencourt's Bank of America account ending in 2852. At around the same time, he closed a Citizens Bank account ending in 0906 in the name of Bettencourt. In addition, on March 14, 2014, the Debtor caused his name to be removed from one of the couple's long-time joint account ending in 1441 at Citizens Bank.

The Debtor testified that the funds in the Fidelity Investments account were the proceeds of his spouse's inheritance, although he never disclosed this on his SOFAs in response to question 14, regarding property held for another, and he was unable to substantiate that assertion. In addition, he testified that his funds were transferred to Mrs. Manfredonia in January of 2014 so that they could engage in free trades. Specifically, he transferred $38,351.10 from his account ending in 7845 to his spouse's Fidelity Investments account. He also indicated that he did not consider transfers of monies between his accounts and those of his spouse to be transfers that needed to be disclosed on his SOFA. Both Mrs. Manfredonia and the Debtor testified that they transferred funds

15

regularly between accounts to pay household bills and that that had been their usual practice for many years.

    D.  <u>Disclosures in the Petition and SOFA</u>

In conjunction with filing his petition on June 25, 2014, the Debtor filed the "Disclosure of Compensation of Attorney for Debtor." On the form, Attorney Fein disclosed that he had agreed to accept $2,800 for legal services on behalf of the Debtor and that $1,500 was received prior to the filing of the statement. Attorney Fein represented that the source of compensation was the Debtor.

The Debtor filed his Schedules and SOFA and other documents on July 7, 2014. On Schedule A-Real Property, he listed his home located at 3 Winchester Drive, Lynnfield, Massachusetts with a value of $600,000, subject to a secured claim in the sum of $633,370. On Schedule B-Personal Property, the Debtor listed four bank accounts, three at Citizens Bank with accounts numbers ending in 8465, 0926 and 1441, and one at Bank of America without an account number and with no money in it.[4] The Debtor also listed a Reliastar life insurance policy with no cash value and "Prudential LTC [long term care] insurance. He disclosed his Fidelity Roth IRA ending in 6991. The Debtor listed a 23% equity ownership in BMC and "1% equity" in Bettencourt. On Schedule D-Creditors

---

[4] The Debtor listed the Citizens Bank account ending in 1441 as a joint account, when, as noted above, the Debtor's name was removed from the account ending in 1441 and was in Mrs. Manfredonia's name only after March 14, 2014. The Citizens Bank account ending in 0926 was a joint account.

holding Secured Claims, the Debtor listed Bank of America with a first mortgage, secured

by his residence, in the amount of $633,670 and the Bank with a claim in the sum of

$2,255,433.51, a portion of which was unsecured.   On Schedule F-Creditors Holding

Unsecured Nonpriority Claims, the Debtor disclosed debts totaling $47,924.95.   On

Schedule I: Your Income, the Debtor listed his occupation as an Uber driver and his

monthly income as $1,000.   He disclosed that his spouse was self-employed by BMC,

receiving net income of $1,000 per month, plus $750 per month in child support.[5]   On

Schedule J: Your Expenses, he listed four dependents, a monthly mortgage payment of

$3,058, plus another mortgage payment of $3,108 relating to an undisclosed obligation on

Schedule D, and total expenses of $6,788, resulting net monthly income of -$4,038.

The Debtor filed his original SOFA with his Schedules.   In response to question 1

regarding "Income from employment or operation of business," the Debtor listed his

income for 2012 as $6,029, for 2013 as $26,146 and for 2014 (year to date) as $12,000.   In

response to question 2 regarding "Income other than from employment or operation of

business," the Debtor answered "None."   The Debtor also answered "None" to questions

10a and 10b regarding "Other transfers, which requires the debtor to list all "property,

other than property transferred in the ordinary course of the business or financial affairs

of the debtor, transferred either absolutely or as security with **two** years immediately

preceding the commencement of this case. . . ." and "property transferred by the debtor

---

[5] As noted below, the Debtor's joint federal income tax return for 2013 did not contain
any Schedule C income from BMC.

17

with **ten years** immediately preceding the commencement of this case to a self-settled trust or similar device of which the debtor is a beneficiary," respectively (emphasis in original).  He answered "None" to question 11 regarding "Closed financial accounts" and to question 14 regarding "Property held for another person."

The Debtor amended the SOFA on November 4, 2014 changing his response to question 2 regarding "Income other than from employment or operation of business" from "None" to $11,652 for "9/24/2013 Prudential Annuity liquidation."

On February 4, 2015, approximately seven months after the commencement of his case, the Debtor amended Schedule B-Personal Property and Schedule C-Property Claimed as Exempt.  On amended Schedule B, he deleted the Citizens Bank account ending in 1441 and added a Citizens Bank account ending in 0057 (although he did not indicate that it was a joint account), as well as the TD Ameritrade joint account ending in 8834 and the Fidelity Investments account ending in 7837.  He still did not specifically disclose his Fidelity Investments account ending in 7845, although he referenced an "unknown Fidelity acct with balance of 91.20.[6]   Additionally, the Debtor disclosed, in response to question 35, "Other personal property of any kind not already listed," "$10,000 tx to to [sic] Fidelity account on 9/24/13, commingled with wife's funds for investing."

---

[6] This statement is disingenuous as the Fidelity Investments monthly statements were consolidated for all three accounts.

The Debtor amended his SOFA again on February 4, 2015, changing his response to question 10a to disclose, in addition to the "$11,562.30 Prudential life insurance liquidation," a $3,000 settlement payment from "Chase" for wrongful foreclosure. In response to question 10a regarding "Other transfers," the Debtor disclosed the following

> The debtor transferred his $11,562 annuity liquidation to his non-debtor spouse's Citizens Bank account ending in 1441 on September 24, 2013. Approximately $10,000 was transferred on the same day to the Debtor's Citizen's [sic] Bank account ending in 8465. These funds were then transferred to the Debtor's Fidelity account and used for investment purposes.

> At various points in time the Debtor and his non-debtor spouse transferred funds to each other's accounts with Fidelity and or TD Ameritrade for the purpose of obtaining commission-free trades. The bulk of these funds originated with the non-debtor spouse after she inherited $140,000 in 2008. The Debtor's sole contribution towards these funds was the liquidation of his Prudential annuity discussed above. The funds have been used for household expenses incurred during and after a major tenant vacated real estate he managed and the failure of his business.

The Debtor did not amend his original answers to questions 11 and 14 on the SOFA.

The Debtor testified that he considered the monies in his and his spouse's Fidelity Investments accounts to be her funds. Moreover, he testified that he did not believe that disclosure of transfers of monies between spouses was required in response to SOFA question 10. He stated that many of the transfers the couple made among their accounts were for the purpose of paying ordinary household bills, in particular the June 12, 2014 transfer from their joint account to his spouse's account. The Debtor denied any fraudulent intent arising from the failure to disclose the transfers. The Debtor, however, produced no evidence as to the amount of the couple's ordinary monthly expenses or

annual bills other than the expenses set forth on his Schedule J.  Nevertheless, given their

income after the Properties were foreclosed, the Debtor and his spouse could not satisfy

their household expenses from their reported income on Schedule I.

E.  The Debtor's Books and Records and Income

As noted above, the Bank introduced bank statements from a number of accounts

held by the Debtor, individually and jointly with his spouse, including account

statements from Fidelity Investments, TD Ameritrade, Bank of America, and Citizens

Bank, as well as accounts for BMC and Bettencourt, adding up to thousands of pages.

Those records were subpoenaed by the Bank.  The Debtor did not introduce into evidence

any records of personal, household or business finances.  The couple conducted all their

personal and business affairs through their various bank accounts, mostly online, and did

not maintain any backup records, invoices, bills, receipts, compilations, reports or

summaries, and none were introduced into evidence. Moreover, as the Receiver reported,

and, as will be discussed more fully below, the couple paid personal expenses from BMC

and Bettencourt accounts.

The Plaintiff introduced joint tax returns filed by the Debtor and his spouse for

2012 (Massachusetts only), 2013 and 2014, as well as BMC's and Bettencourt's tax returns

for some of those years.  For example, BMC's 2012 gross receipts were $74,601, yet it

reported a loss of $7,524.  The couple's joint federal income tax return for 2013 reflected

total income of $26,146, the same amount of income the Debtor reported on his SOFA as

his income, and adjusted gross income of $5,508.  This return also included a net short

20

term loss of $26,802 from stock transactions which involved the sale of $2,774,049 in stocks with a cost basis of $2,868,419.  For the 2014 tax year, the couple also reported short term losses of $19,217, after adjustment, on proceeds of sales of stock totaling $4,639,952 with a cost or other basis of $4,880,785.  These transactions were associated with the Fidelity Investments accounts and TD Ameritrade accounts.

The Debtor testified that he obtained information to prepare the couple's joint tax returns from his review of their bank account records.  He used the same methodology for BMC and Bettencourt to enable their accountant, Jacobs, Velella & Kerr, P.C., to prepare their returns.  Thus, the only evidence from which the Debtor's income and expenses can be discerned are bank records.

As noted above, the Debtor listed his income on his original and amended SOFAs for 2012 as $6,029,[7] for 2013 as $26,146[8] and for 2014 as $12,000 (year to date).   At trial,

---

[7] The Plaintiff did not submit a copy of the joint federal tax return for the Debtor and his spouse for 2012.  On the Massachusetts return for that year, the couple reported $17,447 in business/profession or farm income or loss and other income of $546.  When adjusted for a loss of $10,786 for "Rental, royalty and "REMIC, Partnership, S corp., trust income/loss," the couple paid tax on $7,207.

[8] This sum was reported on the couple's 2013 federal tax return as their total income; $23,055 was attributable to Schedule C income, i.e., "Profit or Loss from Business."  The business was identified as LTM Enterprises.  They also reported a capital loss of $3,000 and taxable income of $3,064 from "pensions and annuities of $23,055. Their adjusted gross income was reported as $5,508. Neither the Debtor nor Mrs. Manfredonia reported any income from wages or salaries and their only income was business income reported on Schedule C.  On Schedule C, the Debtor, who prepared the return, reported gross receipts of $67,000 subject to expenses of $7,258 for employee benefit programs, $4,205 for mortgage payments, $2,500 for legal and professional services, $7,428 for office

the Debtor testified that he believed his income for 2013 was between $30,000 and $34,000,

excluding Mrs. Manfredonia's income.   The Debtor was unable to state what his income

was for 2013 with any certainty, although he testified that his earnings were deposited

into the Citizens Bank accounts.

Mrs. Manfredonia gave conflicting testimony about her income for 2013.  At one

point, she testified that her income was approximately $72,000, and, at another time, she

said it was between $60,000 and $80,000 for 2013.  Both the Debtor and Mrs. Manfredonia

testified that their earnings were deposited into their Citizens Bank accounts - - either his

or hers or their joint accounts.  The Citizens Bank account statements reveal that the total

deposits in the couple's joint Citizens Bank checking account ending in 1441 during 2013

was $150,921.38.  Of that sum, $80,000 was transferred from BMC's account ending in

0752.  The total amount deposited in their  joint Citizens Bank account ending in 8465,

which the Debtor testified was his personal checking account (although it was a joint

account), for the same year was $136,442.08.  The Debtor transferred $58,000 from that

account to his Fidelity Investments account ending in 7845 and $3,000 to his Fidelity

Investments account ending in 7843 during this period.  Nevertheless, as set forth in note

8, *supra*, the couple reported total income in 2013 of $26,146, most of which was

attributable to income from LTM Enterprises.  Moreover, the Debtor reported that sum

as *his* income for 2013 on his SOFA.

---

expenses, $3,331 for supplies, $7,220 for travel and $11,193 for deductible meals and
entertainment.

The Debtor and Mrs. Manfredonia caused a number of personal expenses to be paid from the accounts of BMC and Bettencourt.  BMC's federal tax return for 2012, Form 1065 U.S. Return of Partnership Income, reflected ordinary business income of -$7,524 as well as a "loan from officers" in the sum of $26,237; for 2013, BMC reported ordinary business income of -$33,609, as well as a loan from officers in the amount of $30,467.  The Debtor testified that some of the money deposited into his and his spouse's bank accounts related to repayment of loans they made to BMC and Bettencourt.  The Debtor, however, did not introduce any promissory notes or other evidence of the dates and amounts of the loans, repayment terms, or payments.  More significantly, in 2013, BMC, on its Form 1065, reported total income of $91,449, approximately $17,000 more than in 2012.  In addition to a few minor deductions, it also reported "Other deductions," totaling $122,348, resulting in the loss of $33,609.  These deductions included the following:

| | |
|---|---:|
| Automobile and truck expense | 1,260 |
| Bank charges | 128 |
| Computer services and supplies | 3,248 |
| Delivery and freight | 135 |
| Dues and subscriptions | 1,000 |
| Insurance | 8,517 |
| Meals and Entertainment | 4,163 |
| Office expense | 597 |
| Parking fees and tolls | 32 |
| Permits and fees | 161 |
| Travel | 8,907 |
| Management fees | 94,200[9] |

---

[9] On its 2012 federal partnership return it claimed a deduction for management fees of $54,882.

It also reported $124,649 in nondeductible expenses, including $54,649 attributable to Bettencourt, as well as Other Liabilities, including "Pass Through Losses Bettencourt Realty LLC" of $644,645, the Loan from officer set forth above, and "L/P – Bettencourt of $454,545." Although the Debtor was the manager of BMC, he did not report receipt of management fees in the sum of $94,200 as income on his federal tax return or SOFA. The statements for the Citizens Bank ending in 1441, however, reflected deposits from BMC's account of $80,000 in 2013.

In 2013, Bettencourt on its Form 1065 reported net rental income of - $6,446. It reported gross rents of $382,705 and real estate expenses totaling $389,151. The expenses included advertising ($183), auto and travel ($12,060), cleaning and maintenance ($3,523), insurance ($14,492), legal and other professional fees ($5,262), interest ($134,420), repairs ($48,346), taxes ($29,648), utilities ($13,866), depreciation ($53,092), bad debt ($50,085), bank charges ($103), supplies ($1,829), telephone ($8,405), meals (50%) ($3,038), management fees ($5,300), travel ($561) and postage/delivery ($231). In view of the Receiver's testimony as to the condition of the Properties in 2014, the Court questions the legitimacy of the expenses for repairs as well as for auto and travel and meals.

The federal tax returns for the Debtor and his spouse and the tax returns for Bettencourt and BMC establish that the Debtor and his spouse used BMC and Bettencourt to pay their personal expenses. The Debtor proffered no testimony explaining how they maintained a $600,000 residence with a mortgage and a household comprised of four

children on income of $26,146 as the Debtor reported on the SOFA for 2013, and which was, according to their federal 2013 income tax return, their joint income.

By way of example, the January 1, 2013 to January 31, 2013 statement for BMC's Citizens Bank account ending in 0752 reveals numerous charges for personal expenditures, as well as the purchase of four airline tickets to Puerto Rico and a payment to the El San Juan Hilton Hotel in Carolina, Puerto Rico. Although Mrs. Manfredonia intimated that these charges were legitimate business expenses for "health and wellness" and that the the purpose of the trip was to investigate the purchase of condominiums, the Court finds her testimony to be unconvincing. The bank account statement for BMC for the month before Bettencourt defaulted on its loan to the Bank reveals a debit charge to Briggs Chiropractic, and debit charges for airline tickets and restaurants in San Francisco and Palo Alto, California. This Court is unpersuaded that an amalgam of buildings containing mostly residential units in Peabody, Massachusetts and a small bookkeeping business could legitimately justify those types of expenses. On the contrary, as the Receiver opined, the Debtor and his spouse simply used the income generated by the Properties to pay their personal expenses either directly from debits from accounts maintained by BMC or Bettencourt, or indirectly in view of the numerous transfers from the BMC account ending in 0752 to 1) the Citizens Bank account ending in 1441, 2) the Citizens Bank account ending in 0926, and 3) the Citizens Bank account ending in 8457, an account belonging to Mrs. Manfredonia.

25

As noted previously, the Debtor did not introduce any exhibits at trial, and, thus, except for the Plaintiff's exhibits, the Court is unable to review records maintained by the Debtor which differentiate between, and account for, his business and personal transactions. The Debtor testified that records of BMC and Bettencourt, including leases, contracts, agreements with housing agencies, as well as bank statements, were destroyed by a tenant who left the premises in late 2013. According to both the Debtor and his spouse, they used their bank account statements as the records of their personal finances and to prepare their joint tax returns, although the Debtor admitted that the couple's individual and joint accounts were intertwined with those of BMC and Bettencourt. That said, the bank statements, coupled with tax returns, raise as many questions as they answer, and the Debtor's actual financial condition at the time he filed his bankruptcy petition is perplexing.

F. The Settlement Between the Trustee and Mrs. Manfredonia

On February 4, 2015, the Debtor filed an amended Schedule B-Personal Property and Schedule C-Property Claimed as Exempt and a motion to approve the amendments. In his motion, the Debtor, through his attorney, stated that the initial Schedules mistakenly identified a bank account owned by his spouse as a joint asset and that he failed to disclose certain bank accounts with Citizens Bank and TD Ameritrade with minimal value. The Debtor amended Schedule B, question 35, to disclose "$10,000 tx to to [sic] on 9/24/13, commingled with wife's funds for investing." He also amended Schedule C to claim an exemption in the September 24, 2013 transfer in the sum of $11,562

26

to his spouse pursuant to 11 U.S.C. § 522(d)(5) to the extent any portion of the transfer was deemed voidable.

The Trustee filed an adversary complaint against Mrs. Manfredonia through which he sought to avoid and recover a $38,351.10 transfer the Debtor made from his Fidelity Investments account on January 24, 2014 to her Fidelity Investments account as a fraudulent transfer under 11 U.S.C. §§ 544 and 548. The Trustee also filed an objection to the Debtor's amended claim of exemption of the Prudential annuity funds. The Trustee asserted that the Debtor also made a $10,000 transfer on September 24, 2013 with actual intent to hinder, delay and defraud creditors and concealed the transfer by failing to disclose it on his original SOFA. According to the Trustee, the claimed exemption was impermissible under 11 U.S.C. § 522(g)(1)(A) and (B). The Debtor filed a response to the Trustee's objection to the claim of exemption, in which he asserted that the funds were his spouse's property and the purpose of the transfer was to pay ordinary, household bills and such expenses were paid in the ordinary course with the funds.

The Trustee, the Debtor and Mrs. Manfredonia entered into a settlement agreement of the Trustee's action against Mrs. Manfredonia and the Trustee's objection to the Debtor's amended claim of exemption pursuant to which Mrs. Manfredonia agreed to pay to the Trustee the amount of $15,000. The Court approved the settlement agreement on July 9, 2015, thus resolving the adversary proceeding and the objection to claim of exemption.

## III. POSITIONS OF THE PARTIES

A. <u>The Plaintiff</u>

The Bank seeks to deny the Debtor a discharge on two separate grounds.  First, it

contends that the Debtor made numerous knowing and fraudulent false oaths in his

SOFAs as he did not list various transfers of money in late 2013 and during the first half

of 2014 from his own bank accounts and bank accounts owned jointly with his spouse to

bank accounts owned solely by his spouse, which transfers totaled approximately

$60,000.  The Bank contends that those transfers were made with intent to conceal the

Debtor's interest in those funds from creditors. The Bank also maintains that the Debtor

did not disclose closures of financial accounts and understated his income on his SOFA

and amended SOFAs.  According to the Bank, the Debtor's disclosures of his income and

prepetition transfers of his assets were deficient and misleading.

Second, the Bank contends that the Debtor failed to keep or preserve, or concealed

recorded information from which his prepetition income and finances might be

ascertained.  In particular, the Bank complains that the Debtor's records are insufficient

to determine which bank or brokerage accounts, or portions thereof, represented his

money or that of his spouse.  It also maintains that his records are inadequate to

determine the Debtor's interest in funds held in bank accounts belonging to Bettencourt

and BMC from which he paid some personal expenses, as well as his interest in joint

accounts held with his spouse.   The Bank further complains that due to the absence of

records, it is impossible to determine the Debtor's income for 2012, 2013 and 2014 from

28

tax returns which do not correspond to his SOFA. The Bank requests that the Court find

that the testimony of the Debtor and Mrs. Manfredonia lacked credibility, referencing

inconsistencies in their testimony; their inability to reconcile their testimony with bank

and brokerage account statements; the Receiver's testimony; and their inability to

recollect important events.

B. The Defendant

As to Count I of the Complaint, through which the Plaintiff seeks a denial of the

Debtor's discharge under 11 U.S.C. § 727(a)(4)(A) for knowingly and fraudulently

making a false oath in connection with the Debtor's case, the Debtor concedes that certain

sworn statements in his original SOFA and the two amendments were not accurate. He

admits that his answers to question 10 on the original SOFA omitted transfers within two

years before the petition date. Notwithstanding his admissions, the Debtor contends that

the inaccurate responses were the result of honest confusion or a lack of understanding

and were not fraudulent.

As to Count II, pursuant to which the Plaintiff seeks denial of the Debtor's

discharge under 11 U.S.C. § 727(a)(3) based on concealment of, or failure to keep and

preserve, recorded information, namely records showing monies allocable to either the

Debtor or his spouse in order to determine their prepetition incomes, the Debtor

maintains that many of the records of his business and his personal affairs were lost

through no fault of his own, either due to computer problems, or destruction by a tenant

who vacated one of the Properties' units. He adds that his prepetition financial affairs

can be ascertained with reference to bank statements and tax returns.  Accordingly, the

Defendant requests a discharge and judgment in his favor on both counts of the

Complaint.

## IV. DISCUSSION

A. <u>Applicable Law</u>

Section 727 of the Bankruptcy Code provides a number of grounds for denial of a

debtor's discharge. The statute provides in pertinent part as follows:

(a) The court shall grant the debtor a discharge, unless-- . . .

> (3) the debtor has concealed, destroyed, mutilated, falsified,
> or failed to keep or preserve any recorded information,
> including books, documents, records, and papers, from which
> the debtor's financial condition or business transactions might
> be ascertained, unless such act or failure to act was justified
> under all of the circumstances of the case;

> (4) the debtor knowingly and fraudulently, in or in connection
> with the case —

> > (A) made a false oath or account;

11 U.S.C. § 727(a)(3), (4)(A).

A plaintiff who seeks denial of a debtor's discharge under 11 U.S.C. § 727 has the

burden of proving that grounds exist by a preponderance of the evidence.  <u>Groman v.</u>

<u>Watman (In re Watman)</u>, 301 F.3d 3, 7 (1st Cir. 2002); <u>Barclays/Am. Business Credit v.</u>

<u>Adams (In re Adams)</u>, 31 F. 3d 389, 394 (6th Cir. 1994), <i>cert. denied</i>, 513 U.S. 1111 (1995).

Once it appears that a sworn statement is false, the burden then falls on the debtor to

come forward with evidence that he has not committed a false oath.  <u>Boroff v. Tully (In</u>

re Tully), 818 F. 2d 106, 110 (1st Cir. 1987) (citing Matter of Mascolo, 505 F.2d 274, 276 (1st

Cir.1974)).  Because § 727(a) "imposes an extreme penalty for wrongdoing," it "must be

construed strictly against those who object to the debtor's discharge and 'liberally in favor

of the bankrupt.'" State Bank of India v. Chalasani (In re Chalasani), 92 F.3d 1300, 1310

(2d Cir. 1996) (quoting Bank of Pennsylvania v. Adlman (In re Adlman), 541 F.2d 999,

1003 (2d Cir. 1976)).

> 1. 11 U.S.C. § 727(a)(3)

With respect to § 727(a)(3),  the United States Bankruptcy Appellate Panel for the

First Circuit recently addressed the purpose of, and elements of proof under, this section

in Harrington v. Simmons (In re Simmons), 525 B.R. 543 (B.A.P. 1st Cir. 2015), aff'd, 810

F.3d 852 (1st Cir. 2016).  In that case, the panel stated:

> "The purpose of § 727(a)(3) is to give creditors, the trustee and the
> bankruptcy court complete and accurate information concerning the
> debtor's affairs and to ensure that dependable information is provided so
> that the debtor's financial history may be traced." Canha v. Gubellini (In re
> Gubellini), No. 09–016, 2009 WL 8466789, at *4 (1st Cir. B.A.P. Nov. 23, 2009)
> (footnote omitted) (citing Meridian Bank v. Alten, 958 F.2d 1226, 1230 (3d
> Cir. 1992)). The standard for disclosure of records for purposes of § 727(a)(3)
> is one of "reasonableness in the particular circumstances." Razzaboni v.
> Schifano (In re Schifano), 378 F.3d 60, 68 (1st Cir. 2004) (internal quotations
> and citations omitted). "[A]n impeccable system of bookkeeping" is not
> required; however, "the records must sufficiently identify the transactions
> [so] that intelligent inquiry can be made of them." Id. at 69 (internal
> quotations and citations omitted). The inquiry into the reasonableness of
> records may include several relevant factors such as "the education,
> experience, and sophistication of the debtor; the volume of the debtor's
> business; the complexity of the debtor's business; the amount of credit
> extended to the debtor or his business; and any other circumstances that
> should be considered in the interest of justice." Id. at 70 n.3 (internal
> quotations and citations omitted).

In re Simmons, 525 B.R. at 547. This Court recently had the opportunity to analyze

the burden of proof and elements of proof under this section:

> Section 727(a)(3) involves a shift in the burden of proof. "The initial burden
> is on the party objecting to discharge to prove two things: (i) that the debtor
> 'concealed, destroyed, mutilated, falsified, or failed to keep or preserve any
> recorded information;' and (ii) that the recorded information was
> information 'from which the debtor's financial condition or business
> transactions might be ascertained.'" Lassman v. Keefe (In re Keefe), 380 B.R.
> 116, 120 (Bankr. D. Mass. 2007). Once the objecting party has met its initial
> burden, the burden then shifts to the debtor to establish either that the
> debtor maintained adequate books and records from which his financial
> condition can be ascertained or that the failure to keep adequate books and
> records can be justified under the circumstances. Cohen Steel Supply, Inc.
> v. Fagnant (In re Fagnant), No. 03–10496–JMD, 2005 WL 1244866, at *3
> (Bankr. D. N.H. Apr. 14, 2005) (citations omitted), aff'd, 337 B.R. 729 (1st Cir.
> BAP 2006). Intent to conceal a debtor's financial condition is not a necessary
> element to support an objection to discharge for failure to keep books and
> records. Thaler v. Erdheim (In re Erdheim), 197 B.R. 23, 29 (Bankr. E.D.N.Y.
> 1996).

Lassman v. Mahfouz (In re Mahfouz), 529 B. R. 431, 445 (Bankr. D. Mass. 2015).  That case

presented the issue of whether joint debtors could be denied a discharge for failure to

keep or preserve records of closely held corporations they owned.  In holding that the

Trustee had sustained his burden of proof under § 727(a)(3), this Court ruled that the

debtors' failure to adequately document both their personal and business income,

expenses, assets and transfers in a manner sufficient to ascertain their financial condition

and business transactions warranted the denial of their discharge. In re Mahfouz, 529 B.R.

at 454.

Failure to keep adequate corporate records has been found by some courts to be

a valid reason for denial of an individual's discharge under § 727(a)(3) where a debtor

was the sole owner of, and conducted business through, a closely held corporation. *See* Wachovia Bank, N.A. v. Spitko (In re Spitko), 357 B.R. 272, 308 (Bankr. E.D. Pa. 2006)(court concluded that the financial records of closely held entities were needed for the trustee and creditors to have accurate information concerning the debtors' assets that might be available for liquidation); Sterling Int'l, Inc. v. Thomas (In re Thomas), No. 01–6321, 2003 WL 21981707, at *11 (Bankr. D. Idaho July 17, 2003) ("[I]n situations where the facts indicate that a debtor exercised control over and conducted business through a closely held corporation, § 727(a)(3) inquiries cannot be artificially limited to those records that are, strictly speaking, those of the debtors."); *see also* Alan N. Resnick and Henry J. Sommer, 6 Collier on Bankruptcy ¶ 727.03[3][e](16 ed. rev. 2015).

There are no per se rules for the adequacy of records. Section 727(a)(3) does not require completeness in a debtor's records, but it does require sufficient records so that creditors and the trustee can accurately ascertain the debtor's financial condition. *See* Caneva v. Sun Communities Operating Ltd. P'ship (In re Caneva), 550 F.3d 755,761 (5th Cir. 2008). A debtor need not have an impeccable system of bookkeeping; however, a debtor must have records which sufficiently identify transactions to permit inquiry about the debtor's financial status and to ascertain a complete and accurate picture of the debtor's financial affairs, including a debtor's business as well as personal finances and activities. *See* Razzaboni v. Schifano (In re Schifano), 378 F. 3d 60, 69-70 (1st Cir. 2004). Sophisticated business persons are generally held to a higher level of accountability for

record keeping than less experienced debtors.  *See* <u>Meridian Bank v. Alten</u>, 958 F.2d 1226, 1231 (3d Cir. 1992).

A number of courts have denied a debtor's discharge under this section where the debtor's only records are bank account records and tax returns.  *See, e.g.*, <u>Hunt v. Steffensen (In re Steffensen)</u>, 534 B.R. 180, 199 (Bankr. D. Colo. 2015), *aff'd*, __ B.R. __, Case No. 2:15-cv-525-RJS-PMW, 2016 WL 5874972 (D. Utah Oct. 7, 2016) (voluminous bank account records, tax returns and bills were nonetheless inadequate to explain finances and loan transactions); <u>Sullivan v. Kickel (In re Kickel)</u>, 357 B.R. 490, 494 (Bankr. N.D. Ill. 2006) (canceled checks, bank statements and checking account ledgers inadequate); <u>Gilbert v. Goldstein (In re Goldstein)</u>, 123 B.R. 514, 524-25 (Bankr. E.D. Pa. 1991) (copies of tax returns inadequate).  "A debtor's records are not satisfactory if a trustee, creditor or the court would have to undertake a time consuming and detailed analysis of bank statements, canceled checks, receipts, and the like in order to determine the debtor's financial condition."  <u>In re Steffensen</u>, 534 B.R. at 203.  Moreover, a debtor's record keeping oriented toward allowing him to complete tax returns may still be inadequate for the purposes of §727(a)(3).  <u>Id</u>. at 205.

2. 11 U.S.C. § 727(a)(4)(A)

With respect to claims under 11 U.S.C. § 727(a)(4)(A), the United States Court of Appeals for the First Circuit frequently has pronounced the legal standards applicable to a debtor's knowing and fraudulent false oaths made in conjunction with schedules and

the statement of financial affairs.  The Court in <u>Boroff v. Tully (In re Tully)</u>, 818 F.2d 106

(1st Cir. 1987), stated:

> Under § 727(a)(4)(A), the debtor can be refused his discharge only if he (i) knowingly and fraudulently made a false oath, (ii) relating to a material fact. The burden of proof rests with the trustee, <u>In re Shebel</u>, 54 B.R. 199, 202 (Bankr. D. Vt. 1985), but "once it reasonably appears that the oath is false, the burden falls upon the bankrupt to come forward with evidence that he has not committed the offense charged." <u>Matter of Mascolo</u>, 505 F.2d 274, 276 (1st Cir. 1974).
>
> The statute, by its very nature, invokes competing considerations. On the one hand, bankruptcy is an essentially equitable remedy. As the Court has said, it is an "overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction." <u>Bank of Marin v. England</u>, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966). In that vein, the statutory right to a discharge should ordinarily be construed liberally in favor of the debtor. <u>Matter of Vickers</u>, 577 F.2d 683, 687 (10th Cir. 1978); <u>In re Leichter</u>, 197 F.2d 955, 959 (3d Cir. 1952), *cert. denied*, 344 U.S. 914, 73 S.Ct. 336, 97 L.Ed. 705 (1953); <u>Roberts v. W.P. Ford & Son, Inc.</u>, 169 F.2d 151, 152 (4th Cir. 1948). "The reasons for denying a discharge to a bankrupt must be real and substantial, not merely technical and conjectural." <u>Dilworth v. Boothe</u>, 69 F.2d 621, 624 (5th Cir. 1934).
>
> On the other hand, the very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction. As we have stated, "[t]he successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." <u>Mascolo</u>, 505 F.2d at 278. Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight. *See* <u>In re Tabibian</u>, 289 F.2d 793, 797 (2d Cir. 1961); <u>In re Shebel</u>, 54 B.R. at 202. The bankruptcy judge must be deft and evenhanded in calibrating these scales.

<u>In re Tully</u>, 818 F.2d at 110.  *See also* <u>Premier Capital, LLC v. Crawford (In re Crawford)</u>,

__ F.3d __, C.A. No. 16-1285, 2106 WL 6569228, at *4 (1st Cir. October 25, 2016).

In Commonwealth of Massachusetts v. Sohmer (In re Sohmer), 434 B.R. 234 (Bankr. D. Mass. 2010), this Court observed that "[c]ircumstantial evidence may be used to prove fraudulent intent that the cumulative effect of false statements may, when taken together, evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent." 434 B.R. at 250 (quoting The Cadle Co. v. Duncan (In re Duncan), 562 F.3d 688, 695 (5th Cir. 2009). See also Sholdra v. Chilmark Fin. LLP (In re Sholdra), 249 F.3d 380, 383 (5th Cir. 2001), cert. denied, 534 U.S. 1042 (2001)). The United States Court of Appeals for the Fifth Circuit in Beaubouef v. Beaubouef (In re Beaubouef), 966 F.2d 174, 178 (5th Cir. 1992), observed that false statements in the debtor's schedules or false statements made by the debtor during the proceedings are sufficient to justify denial of discharge and that the materiality of an omission is not solely based on the value of the item omitted or whether it was detrimental to creditors because the statement need only "'bear [ ] a relationship to the bankrupt's business transactions or estate, or concern[ ] the discovery of assets, business dealings, or the existence and disposition of his property.'" In re Sohmer, 434 B.R. at 250 (quoting In re Duncan, 562 F.3d 695 and citing In re Beaubouef, 966 F.2d at 178, and Chalik v. Moorefield (In re Chalik), 748 F.2d 616, 617 (11th Cir. 1984)).

Under §727(a)(4), "[t]he existence of a false or inaccurate statements is not, in and of itself sufficient cause to deny a debtor's discharge, unless it is shown that these were knowingly and fraudulently made." Premier Capital v. Diamond (In re Diamond), 106 F.App'x 73, 78 (1st Cir. 2004). Fraudulent intent under this section is satisfied by a showing of reckless disregard for the truth. See In re Tully, 818 F. 2d at 112; Vasiliades v.

36

<u>Dwyer</u>, No. Civ. A. 05-10479-FDS, 2006 WL 1494081, at *16 (D. Mass. 2006).  Reckless

disregard for the truth may be found based on the cumulative effect of a series of innocent

mistakes.  <u>Discenza v. MacDonald (In re MacDonald)</u>, 50 B.R. 255, 259 (Bankr. D. Mass.

1985).  Because there is rarely direct evidence of fraudulent intent, it may be established

by circumstantial evidence or inferred from a course of conduct.  <u>Desmond v. Varrasso</u>

<u>(In re Varrasso)</u>, 37 F.3d 760, 764 (1st Cir. 1994); <u>Dotson v. Cogswell (In re Cogswell)</u>, 462

B.R. 28, 33 (Bankr. D. Mass. 2012).  A debtor's honest confusion or lack of understanding

may weigh against a finding of fraudulent intent.  <u>Hatton v. Spencer (In re Hatton)</u>, 204

B.R. 477, 484 (E.D. Va. 1997).

The United States Court of Appeals for the First Circuit recently has observed that

a debtor is required to prepare the Schedules and SOFA with sufficient detail to enable

the trustee to determine whether to investigate further and that the omission of

transactions from the SOFA constitutes a false oath.  <u>In re Crawford</u>, 2016 WL 6569228, at

*4.  The court added: "we have rejected the notion that valuation determines materiality."

<u>Id.</u> at *5 (citing <u>Boroff</u>, 818 F.2d at 110, n.4)(footnote omitted).

B. <u>Analysis</u>

1. Count II - §727(a)(3)

Upon consideration of the credible evidence presented at trial, the Court finds that

the Plaintiff sustained its burden of proving that the Debtor did not keep and preserve

adequate records of his personal and business affairs.  The only exhibits introduced at the

trial were documents submitted by the Plaintiff, primarily copies bank and brokerage

account statements and tax returns for the Debtor, his spouse, BMC and Bettencourt. Because the Debtor failed to introduce any documents or evidence of records that would adequately reveal his financial condition and personal and business transactions, he did not sustain his burden when it shifted to him to come forward with evidence to rebut the Plaintiff's evidence. *See* In re Crawford, 2016 WL 6569228, at *3 ("Once that party puts forth a prima facie case, the burden shifts to the debtor, who must then come forth with evidence rebutting the offense.").

The Debtor did not introduce any records from which the sources of his income or assets could be ascertained. The voluminous bank statements for the Debtor, his spouse, and their business accounts, coupled with their personal and business tax returns, did not adequately explain, or even paint a clear picture of, the Debtor's income and the sources of it. Indeed, the converse is true. The Debtor's testimony and disclosures on the SOFA about his income cannot be reconciled with the bank account deposits and tax returns. Likewise, the Debtor did not introduce any documents to show the purposes of many deposits to, and check and wire transfers from, his bank accounts. He introduced no documentary evidence to explain deposits or transfers, or any records to supplement the bank statements introduced by the Plaintiff.

The Debtor did not introduce any records that he maintained with respect to the finances of either Bettencourt or BMC, limiting the Court's review solely to bank and investment account statements and tax returns for three years submitted by the Plaintiff. Most significantly, the Debtor produced no records documenting rents received,

including security deposits and cash received from tenants of his former Properties, and

he made no attempt to reconstruct the records if, in fact, they were destroyed by a tenant

as the Debtor claimed.  Although the Debtor testified that Bettencourt and BMC repaid

loans that he and his spouse had made to those entities, he introduced no records or

documentation of such loans, such as promissory notes.

Even after reviewing the bank and investment account statements and tax returns,

the Court is unable to fully comprehend the Debtor's finances, especially his income and

expenses, except it is clear that he and his spouse used the monies in the accounts of BMC

and Bettencourt as their own.  In the absence of documents that would adequately explain

his finances, the Debtor's financial condition cannot be reconstructed from the Plaintiff's

exhibits and testimony at the trial, particularly in view of the volume of trading in his

Fidelity Investments account and Mrs. Manfredonia's Fidelity Investments account and

TD Ameritrade account, which as of August 31, 2014 reflected year to date securities

purchased of $2,496,097.99 and year to date securities sold of $2,498,931.71.  The bank

statements, which the Debtor contends are his primary records, do not explain the

sources of many deposits, or the reasons for many withdrawals.  The Debtor essentially

testified that he maintained no personal records, that he relied on bank statements as his

personal records, and that each year he recreated the activity of his businesses and the

couple's personal finances for purposes of filing their joint tax returns.  As a certified

public accountant, sophisticated investor, real estate owner, and property manager, the

Debtor would be expected to keep more than the bare-bones statements and records

39

produced by the Plaintiff.  The puzzle created by the Debtor's finances simply cannot be solved, unless one were to conclude that he was improperly manipulating his income and expenses to avoid paying federal and state income taxes, and, thus, deliberately obscuring his financial condition.

The burden shifted to the Debtor to demonstrate that his failure to keep and preserve adequate records was justified. The Debtor proffered three reasons to justify his failure to produce records:  first, that most of his business income and expense records were maintained originally on QuickBooks and that data was destroyed in a computer crash sometime in 2006 and 2007; second, that he maintained only "web based records" and performed online transactions; and third, that all paper records of his businesses and a flash drive on which electronic data was stored were destroyed by a tenant of his Properties in December 2013 or early 2014.  His testimony about the unavailability of, and destruction of, records was vague and unconvincing.  The Court concludes that his testimony was devoid of credibility and too "convenient" to be believable. The Debtor failed to offer any convincing explanation to rebut the Receiver's assertions that there are approximately $99,000 in funds unaccounted for, and missing from, Bettencourt and that the Debtor collected rents from tenants that should have been paid to the Receiver.  In this regard, the Court notes that the accounts maintained by BMC (account ending in 7052) and Bettencourt (account ending in 0906) contained many "deposits," which were unexplained, were likely from rental income, and may well have been cash.

Finally, the Court rejects the Debtor's argument that because the IRS audited his tax returns and did not make any additional assessment, his records must be sufficient under § 727(a)(3).  The Debtor submitted no evidence as to the scope of the IRS's audit or the basis of the IRS's decision.  Moreover, the IRS's decision is not relevant to the inquiry of the sufficiency of a Debtor's records, and is not binding with respect to the elements for denial of discharge under § 727(a)(3).  For those reasons, the Court concludes that the Debtor's discharge should be denied for failure to keep and preserve adequate books and records.

### 2. Count II - § 727(a)(4)

The Court also concludes that the Plaintiff proved that the Debtor is not entitled to a discharge under § 727(a)(4)(A) as his Schedules and SOFA were deficient owing to the Debtor's false oaths and omissions in his sworn bankruptcy documents.

The Debtor, in response to question 2 on Schedule B, which requires a debtor to list among other accounts, checking, savings, and brokerage accounts, initially listed three Citizens Bank accounts and one Bank of America account.  He failed to list a joint Citizens Bank account ending in 0057.  He did not list that account until February 4, 2015.  Also, he initially failed to list his brokerage accounts at Fidelity ending in 7837 and 7845, as well as his joint TD Ameritrade account ending in 8834.  He listed a Citizens Bank account ending in 1441 as a joint account when, in fact, his name had been removed from that account in March of 2014 and he did not list that closed account on his SOFA.

41

On February 4, 2015, approximately seven months after the commencement of his case, the Debtor amended Schedule B-Personal Property and Schedule C-Property Claimed as Exempt.  On amended Schedule B, the Debtor added the Citizens Bank account ending in 0057, although he did not indicate that it was a joint account, as well as the TD Ameritrade joint account ending in 8834 and the Fidelity account ending in 7837.  He still did not specifically disclose his Fidelity account ending in 7845, although he referenced an "unknown Fidelity acct with balance of 91.20 as a retirement account. The failure to disclose the Fidelity account ending in 7845 is particularly egregious 1) because it declined in value from $40,107.64 at the end of 2013 was $40,107.64 to $102.71 one month later, at the end of January 2014, and 2) because the Debtor received combined statements from Fidelity Investments for all three accounts.  *See* <u>In re Crawford</u>, 2016 WL 6569228, at *4-5.

Schedule B, item 12, requires an individual filing for bankruptcy to disclose "[i]nterests in IRA, ERISA, Keough, or other pension or profit sharing plans" and to "[g]ive particulars." In addition, this form requires a description of the property as well its location and current value.  On his original Schedule B, the Debtor only listed his Roth IRA account ending in 6199.  The Debtor could and should have listed his other Fidelity Investments accounts because, as noted above, he received combined statements from Fidelity Investments for all three accounts.  His failure to timely disclose those accounts permits one and only one inference - - an attempt to conceal assets through a materially false statement under oath.

42

The Debtor filed his first version of the SOFA on July 7, 2014, and amended it twice, first on November 4, 2014 and then again on February 4, 2015. His first and second versions of the SOFA were like his disclosures on Schedule B both untimely and deficient. His response to Question 10 on both the first and second SOFAs concerning transfers within the two years before the bankruptcy petition was "None," a response which was false.

All three versions of the SOFA were inaccurate in a number of material respects. The Debtor's disclosures in the various versions of his SOFA with respect to monies held and transfers made between bank accounts, both his own accounts and accounts held jointly with his spouse were inadequate and contained false oaths which were knowing and fraudulent. The Debtor's testimony at the trial regarding the transfer of monies among bank accounts was not credible, and any mistakes cannot be excused due to honest confusion or lack of understanding where the Debtor is a certified public accountant and sophisticated investor.

First, the Debtor failed to disclose the transfer of of $38,351.10 in January 2014 from his individual Fidelity Investments account ending in 7845 to Mrs. Manfredonia's Fidelity Investments account. That transfer was made when the Debtor was in financial trouble. Secondly, the three versions of the SOFA failed to disclose transfers made in May and June 2014 from the couple's joint account at Citizens Bank ending in 8465 to an account held solely by Mrs. Manfredonia ending in 0934. In addition, the Debtor did not disclose another transfer of $4,000 on June 13, 2014 from the couple's joint account to an account

43

held solely by Mrs. Manfredonia.  The Debtor's proffered explanation for his failure to

disclose those transfers, namely lack of understanding, is devoid of merit.  Third, the

Debtor failed to disclose in any version of the SOFA the removal in March of 2014 of his

name from a joint bank account at Citizens Bank ending in 1441.  That information should

have been disclosed in response to SOFA Question 11, requiring disclosure of closed bank

accounts, although he removed the account ending in 1441 on his amended Schedule B.

That account should have be reported as closed by the Debtor because his name was

removed from it and the account became the sole property of his spouse.  In April, May

and June of 2014, substantial deposits were made into that account, mainly from online

transfers from other accounts.  Although at trial the Debtor and Mrs. Manfredonia

testified that her income was deposited into that account, her income was not sufficient

to explain all of the deposits.  Moreover, the Debtor produced no evidence of what her

income was that was consistent with income they reported on the federal tax returns.  The

couple reported on their federal income tax return for 2013 total income of $26,146, a sum

derived from Schedule C for LTM Enterprises.  Accordingly, the conclusions are

inescapable:  the Debtor either lied on the SOFAs with respect to question 2 regarding his

income, or Mrs. Manfredonia lied about her income both at trial and on the couple's tax

returns.

The original version of the SOFA was materially inaccurate in that the Debtor

failed to disclose that he cashed in his annuity with Prudential in September of 2013 and

received proceeds at that time in the sum of $11,432.30, which he later transferred to his

44

spouse.   Although the amended SOFA disclosed the Prudential annuity and the transfer

of its proceeds, these disclosures were after questions about the annuity and its proceeds

posed by the Plaintiff's attorney and the Chapter 7 trustee at the meeting of creditors and

a Rule 2004 examination of the Debtor.   After the disclosure, the Trustee filed an

adversary complaint against Mrs. Manfredonia to avoid and recover the transfer as an

actual or constructive fraudulent transfer under 11 U.S.C. §§ 544, 548 and 550, which the

parties ultimately settled.   The settlement agreement included a payment of $15,000 by

Mrs. Manfredonia to the Trustee and did not contain any release provisions.

The Debtor's excuses for inaccuracies in his SOFA are: 1) that the Fidelity

Investments and Prudential accounts were established with his spouse's funds; and 2)

that he did not believe that he was required to disclose the transfers to his spouse.  The

Debtor's proffered explanations are inconsistent with the history of the accounts and lack

any semblance of plausibility. The Prudential and Fidelity Investments accounts were

significant assets.  Accordingly, the Court is unpersuaded that the Debtor's omission of

both of them was either an oversight or inadvertent, particularly in view of the

consolidated statements.   Moreover, as to the transfers of funds to his spouse, it is not

credible that he did not understand the SOFA question which requires disclosure of

information about all transfers.  The badges of fraud were present and these transfers

were clearly fraudulent transfers which were avoided and recovered by the Trustee in

the settlement with Mrs. Manfredonia.  *See* Max Sugarman Funeral Home, Inc. v. A.D.B.

Investors, 926 F.2d 1248, 1255 (1st Cir. 1991).

45

3. 11 U.S.C. § 727(a)(2)(A)

In its Complaint, the Plaintiff did not bring a count to deny the Debtor's discharge under 11 U.S.C. § 727(a)(2)(A) which serves as grounds for denial of discharge where the debtor fraudulently transfers property within one year before the date of the filing of the bankruptcy petition "with intent to hinder, delay, or defraud a creditor." Nevertheless, the Plaintiff sustained its burden of proof with respect to such a claim. *See* Marrama v. Citizens Bank of Massachusetts, 445 F.3d 518, 522 (1st Cir. 2006). The Plaintiff submitted the Settlement Agreement between the Chapter 7 Trustee, the Debtor and Mrs. Manfredonia, and the Motion to Approve the Settlement Agreement, which the Court granted, into evidence as Exhibits 17 and 18. Thus, although the issue of whether the Debtor should be denied a discharge under § 727(a)(2)(A) was not raised by the pleadings, it was tried by implied consent.

In In re Crawford, 2016 WL 6569228, the United States Court of Appeals for the First Circuit stated:

"Federal Rule of Civil Procedure 15(b) allows an unpleaded claim to be considered when the parties' conduct demonstrates their express or implied consent to litigate the claim." Antilles Cement Corp., 670 F.3d at 319. "When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." Fed. R. Civ. P. 15(b)(2).

A party can give implied consent to the litigation of an unpleaded claim in two ways: by treating a claim introduced outside the complaint 'as having been pleaded, either through [the party's] effective engagement of the claim or through his silent acquiescence'; or by acquiescing during trial 'in the introduction of evidence which is relevant only to that issue.'

46

Antilles Cement Corp., 670 F.3d at 319 (alteration in original) (quoting
Rodriguez v. Doral Mortgage Corp., 57 F.3d 1168, 1172 (1st Cir. 1995)).

In re Crawford, 2016 WL 6569228, at *2-3 (footnote omitted).  As noted above, in view of

the exhibits introduced at trial without objection as to the Trustee's settlement of a

fraudulent transfer complaint against Mrs. Manfredonia, the Court finds that §

727(a)(2)(A) forms an independent basis for the denial of the Debtor's discharge.

## V. CONCLUSION

In accordance with the foregoing finds, the Court shall grant judgment to the

Plaintiff under 11 U.S.C. § 727(a)(3), (a)(4)(A) pursuant to Counts I and II of its Complaint

and under 11 U.S.C. § 727(a)(2)(A) which was tried with the Defendant's consent.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

November 16, 2016

47